# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

## No. ACM 39929

————————————

### UNITED STATES
*Appellee*

**v.**

### Craig P. GARDNER
Technical Sergeant (E-6), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 16 November 2021

————————————

*Military Judge:* Mark W. Milam; Christina M. Jimenez (post-trial).

*Sentence:* Sentence adjudged on 12 September 2019 by GCM convened at Spangdahlem Air Base, Germany. Sentence entered by military judge on 1 April 2020: Dishonorable discharge, confinement for 2 years, reduction to E-1, and a reprimand.

*For Appellant:* Major Matthew L. Blyth, USAF; William E. Cassara, Esquire.

*For Appellee:* Lieutenant Colonel Matthew J. Neil, USAF; Major Allison R. Barbo, USAF; Major Jessica L. Delaney, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, KEY, and MEGINLEY, *Appellate Military Judges*.

Chief Judge JOHNSON delivered the opinion of the court, in which Senior Judge KEY and Judge MEGINLEY joined. Judge MEGINLEY filed a separate concurring opinion.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

JOHNSON, Chief Judge:

A general court-martial composed of a military judge alone convicted Appellant, contrary to his pleas, of one specification of sexual abuse of a child in violation of Article 120b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920b.[1] The military judge sentenced Appellant to a dishonorable discharge, confinement for two years, reduction to the grade of E-1, and a reprimand. The convening authority waived automatic forfeitures of pay and allowances for a period of six months for the benefit of Appellant's spouse and dependent children, and he provided the language of the adjudged reprimand; otherwise, the convening authority took no action with respect to the adjudged sentence. The military judge signed an entry of judgment reflecting the adjudged findings and sentence, including the reprimand language.

Appellant raises the following issues for our review on appeal: (1) whether the evidence is legally and factually insufficient to support Appellant's conviction for sexual abuse of a child;[2] (2) whether the original military judge, Judge Milam, abused his discretion when he failed to recuse himself *sua sponte* and, relatedly, whether the military judge who presided at the post-trial Article 39(a), UCMJ, 10 U.S.C. § 839(a), hearing, Judge Jimenez, abused her discretion when she denied the Defense's post-trial motion for a mistrial; (3) whether the military judge abused his discretion by permitting three government witnesses to present testimony that either went to the ultimate issue, or was the functional equivalent of "human lie detector" testimony; (4) whether the convening authority erred by failing to take action on the sentence; and (5) whether the convening authority erred by failing to act on Appellant's requests for deferment of confinement, reduction, and forfeitures, and by failing to state his reasons for denying the requests.[3] In addition, although not raised by Appellant, we consider whether he is entitled to relief for facially unreasonable post-trial delay. We find no error materially prejudicial to Appellant's substantial rights, and we affirm the findings and sentence.

---

[1] References to Article 120b, UCMJ, are to the *Manual for Courts-Martial, United States* (2016 ed.). Unless otherwise indicated, all other references to the UCMJ and the Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Appellant personally asserts the evidence was legally insufficient pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[3] For purposes of analysis, we have reordered and consolidated the issues presented in Appellant's assignments of error.

## I. BACKGROUND

In April 2018, Appellant was assigned to the Air Force element at NATO Headquarters in Belgium. Appellant lived in a nearby community with his wife, BG; his 12-year-old stepdaughter, HB; and two young daughters he had with BG. HB's best friend at the time, MW, who was also 12 years old, lived nearby with her mother, Ms. W, and her father, Commander (CDR) JW, a United States Navy officer.

On 21 April 2018, Appellant, HB, Appellant's younger daughters, and MW attended a daytime event at a nearby American military base. At the time, Appellant's wife BG was out of the country. At some point, MW obtained permission from her mother Ms. W to spend the night with HB at Appellant's home. MW had spent the night with HB on multiple prior occasions, but on those occasions HB's mother BG had been present. Ms. W was not aware that BG was away from the home on 21 April 2018.

When Appellant, HB, MW, and the younger daughters returned to Appellant's house, HB and MW played together. At some point MW was sprayed with water and got wet, and she changed into a set of HB's clothes. In addition, Appellant's friend and former co-worker PL, a male civilian British national, arrived at some point during the afternoon. Together Appellant and PL barbequed food for the children. Appellant and PL both drank some amount of beer over the course of the afternoon and evening. After the meal, HB and MW spent time upstairs in HB's room, and afterwards they played music and danced in the living room where Appellant and PL were. Later that night, the four of them began watching a movie together, after the younger daughters had gone to sleep. They sat on a sofa in the living room with Appellant on one end and PL on the other; MW sat between Appellant and HB. PL and HB fell asleep while the movie was playing.

At trial, MW testified[4] regarding her memory of what happened next. Appellant asked MW if he could turn off the television, which he did. As MW lay on the sofa in the dark, she felt "a hand going in [her] shirt," making skin-on-skin contact. This made MW feel "confused," "scared," and "embarrassed." MW felt the hand touch her "stomach," "side," and "thigh." MW "tried moving away, and kind of pretend[ed she] was asleep," and she "kind of moved over to . . . push out his hand," but instead the hand "got a bit higher" underneath her shirt, which made MW "more scared." As this was going on, MW heard Appellant "breathing weirdly" and "really loud in [her] ear," and "he kept asking if [MW] was okay," many times. MW testified Appellant moved his hand "quite a bit times [sic] back and forth," and was also "kind of touching [MW's] butt."

---

[4] MW was 14 years old at the time of Appellant's trial.

At one point Appellant asked MW if she wanted to go to HB's room, which MW "denied." During the direct examination, trial counsel used a demonstrative exhibit to have MW indicate for the military judge that Appellant touched her on the right side of her abdomen, her right upper thigh and hip, and her right buttock.

MW testified that she eventually crawled off the sofa and onto the floor of the living room. She remained there for approximately two minutes before moving upstairs to a "lounge area" where she lay down on a sofa and fell asleep. MW awoke when HB "flopped" onto the sofa next to her, after which Appellant told them to go sleep in HB's room, which they did.

The next morning, MW sent a text message to her mother Ms. W asking to be picked up from Appellant's house earlier than she had originally planned. According to Ms. W's testimony, when she picked up MW, her daughter seemed "odd," "pale," and "withdrawn," which Ms. W initially assumed was due to MW staying up very late the night before. When they got into Ms. W's car, Ms. W asked MW if she was "okay." In response, MW shook her head and said "no," and told Ms. W that Appellant had "put his hand in [her] shirt." Ms. W asked MW, "Are you f**king kidding me?" MW responded, "No," and in response to another question, MW again said Appellant put his hand "in" her shirt. Ms. W did not learn additional details about the incident at that time because MW said she did not want to talk about it.

Ms. W did not immediately report the incident. The following day, a Monday, she discussed what MW had told her with her friend, Mrs. B, who advised her to "tell somebody." The next day, Tuesday, Ms. W contacted the school psychologist[5] of the middle school MW and HB attended, who advised her to contact Family Advocacy. When Ms. W contacted Family Advocacy, she was advised to contact the Belgian police. On Wednesday, Ms. W went to the Belgian police where she was interviewed by a detective and made a written statement. The following week Ms. W also made a statement to the Air Force Office of Special Investigations (AFOSI).

---

[5] Ms. W consistently referred to this individual, Dr. MS, as a "psychiatrist." Dr. MS did not testify during the court-martial, but other information in the record indicates she was a psychologist rather than a psychiatrist. This opinion will refer to Dr. MS as a psychologist unless quoting directly from the trial transcript.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218 (C.A.A.F. 2018), *cert. denied*, __ U.S. __, 139 S. Ct. 1641 (2019) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Thus, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citation omitted), *aff'd*, 78 M.J. 218 (C.A.A.F. 2018) (quoting *Washington*, 57 M.J. at 399).

Article 120b(c), UCMJ, provides: "Any person subject to this chapter who commits a lewd act upon a child is guilty of sexual abuse of a child and shall be punished as a court-martial may direct." 10 U.S.C. § 920b(c). A "child" is "any person who has not attained the age of 16 years." *Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 45b.a.(h)(4). The term "lewd act" includes, *inter alia*, "any sexual contact with a child." *MCM*, pt. IV, ¶ 45b.a.(h)(5)(A). "Sexual contact" includes "any touching . . . either directly or through the clothing, [of] any body part of any person, if done with an intent to arouse or gratify the sexual desire of any person." *MCM*, pt. IV, ¶ 45.a.(g)(2)(B); *see MCM*, pt. IV, ¶ 45b.a.(h)(1). Accordingly, in order to convict Appellant of

the offense charged in this case, the Government was required to prove: (1) that Appellant, on or about 21 April 2018, touched MW's stomach, thigh, and buttocks with his hand, directly or through clothing; and (2) that he did so with the intent to arouse or gratify his sexual desire. *See MCM*, pt. IV, ¶ 45b.b.(4)(b).

### 2. Analysis

MW's testimony was the essential evidence supporting Appellant's conviction. As described above, MW testified that Appellant touched her stomach area, her thigh, and her buttock with his hand. Moreover, under the circumstances, a reasonable factfinder could conclude Appellant did so in order to arouse or gratify his sexual desire. *See King*, 78 M.J. at 221 (citations omitted) ("[T]he [G]overnment is free to meet its burden of proof with circumstantial evidence . . . ."). MW's description of the location and persistent nature of the touching, the skin-on-skin contact, Appellant's "weird" and "really loud" breathing, and his repeated inquiries whether MW was "okay" could lead a rational factfinder to conclude Appellant was touching MW for his sexual gratification. The touching stopped only when MW moved from the couch to the floor to avoid it. MW reported the touching to her mother Ms. W the next morning. Although MW was the only witness who directly described the touching, the testimony of a single witness may be sufficient to establish guilt beyond a reasonable doubt so long as the trier of fact finds the witness's testimony sufficiently credible. *United States v. Rodriguez-Rivera*, 63 M.J. 372, 383 (C.A.A.F. 2006) (citations omitted). The military judge observed the testimony of MW and evidently found her testimony convincing beyond a reasonable doubt.

Although they did not observe the offense, other prosecution witnesses provided testimony that lent some support to the credibility of MW's testimony. Appellant's stepdaughter HB and his friend PL were asleep when the offense took place, but both provided testimony regarding the preceding events on 21 April 2018 that generally supported MW's account. Ms. W testified that MW contacted her unexpectedly early the day after the offense to be picked up from Appellant's house, that something appeared to be wrong with MW which prompted Ms. W to ask if MW was "okay," and that MW responded that she was not and told Ms. W Appellant had put his hand inside her shirt—all of which supported MW's account of events. In addition, the Government called Dr. HR to testify as an expert in forensic psychology and pediatric forensic psychology. Dr. HR testified, *inter alia*, that the AFOSI agent who conducted the forensic interview of MW did a "really good job," and that it was "very unlikely"

that MW confabulated[6] her memory of the offense—in other words, that her memory of it had been contaminated—under the circumstances of this case.

Appellant makes several specific arguments as to why the evidence is insufficient to support the conviction. He suggests that MW may actually have fallen asleep on the sofa before Appellant touched her. More specifically, he points to evidence that MW was a very restless sleeper who tended to move around a lot; he suggests this may have prompted Appellant to touch her innocently and ask her if she was all right, which MW misperceived as more prolonged and nefarious than it was. However, a reasonable factfinder could discount this argument in light of MW's testimony of the nature, duration, and circumstances of the touching, as well as Dr. HR's testimony that MW's memory was unlikely to have been contaminated.

Appellant also points to an inconsistency between the testimony of Ms. W and MW. Ms. W testified that after she provided her statement to the Belgian police, she received a paper copy of it which she left on a table at her home. She testified that MW subsequently saw the copy on the table and became "mad" at Ms. W, because the statement contained certain information that was wrong. Later in the trial, the military judge recalled MW who testified that she did not remember seeing the statement Ms. W wrote for the Belgian police or getting upset with Ms. W about the statement. In addition, MW testified she learned Ms. W had gone to the Belgian police when Ms. W took MW to "where [MW] did the interview"—presumably referring to MW's later AFOSI interview. However, MW was not involved with the Belgian police, and it stands to reason that Ms. W's statement to the Belgian police would have been much more memorable to her than to MW. MW may have simply forgotten about or attached little significance to this minor aspect of the larger, and likely stressful, process of reporting the incident to law enforcement. Assuming Ms. W's testimony is correct, we are not persuaded that MW's evident failure to remember seeing the statement substantially impeaches her testimony regarding the offense.

Appellant also contends that MW's description of the offense "evolved" over time in such a way as to create reasonable doubt. However, a reasonable factfinder could disagree. Appellant emphasizes that MW initially told Ms. W that Appellant put his hand in her shirt; she did not initially mention that Appellant also touched her thigh, hip, or buttocks. MW also testified that she did not tell the school psychologist about being touched on the buttocks. However, MW testified that the touching began with Appellant putting his hand inside her

---

[6] Dr. HR described "confabulation" as "anything that might contaminate a memory and make that memory less than what it would be if it had been recorded on a DVD."

shirt; it is reasonable that this is the specific touching MW would initially report to her mother. In addition, given Ms. W's shocked reaction, and Ms. W's testimony that MW said she did not "want to talk about it anymore," it is unsurprising that MW did not provide her mother with a complete description of events upon her initial report. It is also unsurprising that law enforcement investigators would develop a more detailed account of the alleged offense, including that Appellant also made contact with MW's buttocks. MW's testimony was substantially consistent with what she told the AFOSI agents.

Appellant points to the testimony of Master Sergeant (MSgt) AG, one of a group of noncommissioned officers who on 24 April 2018 went to Appellant's house to inform him of the allegations and that he was being removed from the home. MSgt AG testified Appellant looked "shocked" and "surprised." However, the trier of fact could reasonably find this testimony was not probative as to Appellant's guilt or innocence. MSgt AG also testified as a character witness for Appellant and was evidently predisposed to believe Appellant was not guilty, which may have influenced his observations and testimony. More significantly, there are multiple reasons why an individual might appear alarmed and "surprised" when a group of noncommissioned officers including his first sergeant informed him he was accused of child abuse and removed him from his residence, regardless of his actual guilt or innocence.

Finally, the Defense introduced several affidavits attesting to Appellant's good moral character generally, and specifically in his interactions with children. In addition, the Defense called MSgt AG and two other noncommissioned officers to testify regarding Appellant's good character for morality, decency, and moral and safe relationships with children. Although relevant, a reasonable factfinder could conclude these opinions about Appellant's behavior generally do not counteract the specific evidence of his actions with MW on the night of the offense.

Drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's conviction for sexual abuse of a child beyond a reasonable doubt. Additionally, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

**B. Alleged Disqualification and Motion for Mistrial**

**1. Additional Background**

Appellant's contention that Judge Milam should have recused himself focuses on the military judge's questioning of Ms. W during her testimony, which was also part of the basis for a post-trial motion for a mistrial.

### a. Military Judge's Questioning of Ms. W

The Government called Ms. W to testify as its second witness, after MW had testified. On direct examination, Ms. W described agreeing to let MW spend the night of 21 April 2018 with HB at Appellant's house, although she was not aware that HB's mother BG was not going to be present, nor that another adult male (PL) besides Appellant would be there. Ms. W testified to picking MW up from Appellant's house earlier than expected the next morning, and to MW telling her in the car that Appellant had put his hand inside MW's shirt. Ms. W described being unsure of what to do, and talking to a friend, to the school psychologist, and to Family Advocacy before making her report to the Belgian police. She described MW seeing her written statement and MW becoming "mad" at her because the statement contained inaccuracies. Ms. W indicated that she learned more about the incident, "little bit by little bit," as time passed, MW was interviewed by AFOSI, and the investigation progressed. Ms. W testified that she did not tell her husband CDR JW about the incident "right away" because he was "out of town," and because she wanted more information before she told him. Ms. W informed CDR JW on the Wednesday night following the incident, after she spoke with the Belgian police.

On cross-examination, among other testimony, Ms. W acknowledged that she erroneously told the Belgian police that Appellant had touched MW's breasts, although MW had not told her that. Ms. W agreed that she "assumed that things had happened," and that as a mother her "mind just kind of goes to the worst place."

After a brief redirect examination, Judge Milam questioned Ms. W on several subjects, including what she would normally do when her daughter was going to spend the night somewhere else, as well as Ms. W's delay in going to the police and in informing her husband about the incident. Judge Milam's questioning included the following:

> Q. [Military Judge] Okay. So you chose not to tell your husband why, until Wednesday?
>
> A. [Ms. W] Well, because he was away, and I knew there wasn't anything he could do at the present. And I still felt like I needed to do something, and I was in the mindset of do this, then do this, then do this. And so it just seemed like I had answers that – for

his questions he's going to ask me. So by Wednesday I felt like, "Okay, I'm going to tell him." Then I didn't know if I was also going to tell him when he got back. But then I thought that that wouldn't be a good idea, that I should probably tell him before, because then that would give him time away to cool down and try to wrap his head around it as well.

Q. When was he due back?

A. Friday.

Q. Okay. So it's just interesting to me. So you - you didn't know what to do, so you called Mrs. [B]? That was your - or, that was your first response, is that what you said?

A. Right.

Q. But not your husband?

A. Well, right.

Ms. W then attempted to describe why Mrs. B was the first person she told and how they "brainstormed" together what Ms. W should do. Ms. W testified, "I just felt like I needed some substance before I called my husband, who is away, and tell him --." Judge Milam interjected:

Q. You needed substance from what, your daughter?

A. No, from [Mrs. B] and, like, to make it feel --

Q. What substance is she going to give you? What substance is she giving you that then you can tell your husband? I don't understand.

A. So --

Q. It seems like your daughter would give you the substance, right? I understand you didn't want to keep peppering her with questions. I'm trying to understand why you wouldn't tell your husband and you would tell your best friend?

A. Because my husband would have been so - he would have been angry, and then he would have asked me a question. And then --

Q. Well, wasn't he going to be angry sometime when he finds out?

A. Well, you're right. But that was the - she was the physical person that I needed a shoulder to cry on if this is all - what do I do? Do I turn him in? She's - that kind of thing.

Q. Okay. Well, it doesn't matter at this point. What - when did you go to the Family Advocacy? . . .

. . .

Q. [H]ere's the big question. And there's a reason I'm asking, not just to poke you --

A. No, I get - I'm --

Q. But it's - you went to Family Advo - you went to your friend, Mrs. [B], you went to Family Advocacy, and then you went to the Belgian police, but you didn't tell your husband until after you went to the Belgian police, right?

A. Right.

Q. Okay. So that, to me, is interesting.

A. Well --

Q. Don't you think that's interesting?

A. No.

Q. Okay. That's okay.

A. But my husband's been - well, it doesn't matter.

Q. Go ahead.

A. I mean, I've done things for myself for so long, because my husband's always away. So I'm sorry, but he's not my first go to, to do things like that. That's sad to say, but he's not. Because he's always away. So for me to ask my best friend is not an - is not an irrational thought for me.

Q. Okay. I - that may be. But then I guess you didn't stop at your best friend. You went to Family Advocacy next, right?

A. No actually I went to the psychiatrist [sic], and she said to go to Family Advocacy.

Q. Right. Okay. So then that's four people that you went to before you talked to your husband, right?

A. I've never done this before, so I was just looking for help wherever I could get it.

Q. I understand. I understand, but what I'm trying to figure out is whether your daughter is being truthful or not.

A. Oh.

Q. That's my job in this, right? And it's interesting to me what a mother does after her daughter gives her the allegations that she gives her.

A. Okay.

Q. Okay? So those are my questions and why I'm asking them. If you want me to play my - show you my cards, then that's why I'm asking you these questions, okay? So it's very interesting to me that you wouldn't call your husband immediately when your daughter tells you that somebody has touched her inappropriately, that's all.

A. But what could he have done?

Q. I guess give you the advice that you sought, right? It's her father.

A. It's --

Q. Okay. It doesn't matter. And I'm - you gave me the information that I needed, thank you. I'm just trying to understand it. . . .

Judge Milam's questions then turned to Ms. W's delay in going to the police. Ms. W testified that initially she "wasn't going to just go to the police," because she needed "help" and "direction."

Q. If you think a crime has been committed, who do you go to? A psychiatrist, or the police?

A. Okay --

Q. Do you think what happened to your daughter is a crime?

A. Yes.

Q. Okay. All right. Thank you. When you spoke with the Air Force police, we call them [AF]OSI, did you clarify with them that you were mistaken in what you told the Belgian police?

A. No.

Q. Okay. Why did you tell the Belgian police that your daughter had her breast touched by [Appellant] if she didn't tell you that?

A. So that statement alone - I don't remember saying it. I signed it, so I must have said it.

Q. Well, you probably read it before you signed it, I would assume?

A. But --

12

Q. Yes? You would have --

A. Yes.

Q. -- re-read it before you signed it?

A. Yes.

Q. Okay.

A. So I don't - I don't know why I would have said that, unless, like - I mean, now I don't know why - I don't know why I said that.

Q. Did your daughter ever tell you that [Appellant] touched her breast?

A. Not - no, she didn't. Nothing was actually said on where he touched her. It was all shown. And when she stuck her hand up her shirt, that's the first thing I thought of.

Judge Milam ended his initial round of questioning of Ms. W shortly thereafter. After a brief redirect examination, trial defense counsel conducted additional cross-examination which focused, in part, on potentially confusing and inconsistent statements made by Ms. W as to when and how she learned more information from MW about the touching incident. Judge Milam then resumed his questioning:

Q. Okay, Mrs. [W], one of the things you said when you were first being asked questions by trial counsel was that when you got to the car with [MW], she said "Mr. Gardner put his hand in my shirt," and your response was, "Are you f**king kidding me?" Right?

A. Right.

Q. Now you just said [on re-cross-examination] it was "Mr. Craig put his hand in my shirt."

A. Okay, I --

Q. So what is it?

A. I don't remember.

Q. So how - that's what your testimony would be, right? Your testimony isn't you make up stuff as you go. Your testimony is,

13

"I don't remember what she called him, but he [sic][7] said he put his hand up my shirt."

A. She would have called him Mr. Craig.

Q. Because now you have two times you've used different names, under oath, as to what she said, right?

A. Okay.

Q. Do you see the problem? Do you see the problem for somebody who is trying to figure out what's going on here? Do you get it? Do you get it?

A. I get it.

Q. Do you get how important this is? Do you get how serious this is?

A. I get how serious this is.

Q. Okay. Then maybe you need to be more careful with your testimony, right? Just like you should be careful when you make a statement to the police that's sworn to under oath, right?

A. Right.

Q. Okay. Good. I'm glad that's clear.

That concluded the questioning of Ms. W. After a short recess and the marking of an unrelated appellate exhibit, trial counsel requested a recess until 0900 the following day.[8] When Judge Milam asked the reason for the delay, trial counsel explained one of the reasons was "[t]he manner and tone of the court's questions to the last witness was unexpected," and "[a]s a result, we might change our witness lineup, including potentially our expert, which we didn't anticipate before. If that happens, . . . the [D]efense will need time to obviously interview them, which they have not." Trial defense counsel responded with, "[W]e're happy to take whatever time is necessary to interview a witness but I think the [D]efense's position is we'd like to continue the trial." Judge Milam then sought clarification from trial counsel, who explained "[t]he manner and tone of the court's questions was unexpected," and he needed to "go back and listen to the questions" because the Government "might need to be calling [its] expert witness at this point to talk about a number of different things. [The Government] need[ed] to have time to consider whether to call him as a witness."

---

[7] Alteration in original.

[8] This occurred at approximately 1045 on the second day of trial.

After some clarification that the Government had not anticipated calling its expert forensic psychologist, Dr. HR, as a witness, the following colloquy ensued:

> MJ [Military Judge]: Okay. Well, and you need to do this because of my tone with the witness? That's what you're going to need to do a bunch of research for?
>
> CTC [Circuit Trial Counsel]: Yes, quite frankly, yes, sir. There's areas that --
>
> MJ: Okay, so let me just back up --
>
> CTC: Yes, sir.
>
> MJ: -- real quick. So my demeanor, what, that she changed her story on the stand on what she testified to, that I should - that I should not have confronted her with that? Should I just let it pass?
>
> CTC: No, sir. This court has --
>
> MJ: Okay.
>
> CTC: -- a high level of concern in some areas that were unexpected. Your high level of concern was demonstrated through your demeanor and tone, and - which demonstrated the value you're placing on certain evidence over other certain evidence. That was unexpected. That was unexpected.

After some additional discussion as to the purpose of the requested delay and the anticipated defense case, Judge Milam stated:

> . . . I'm trying to think how I wanted to state this. I look at a court as a sort of a place that is sacred for getting truth from people, especially when a witness raises their hand and says they're going to tell the truth. So when that doesn't happen, or when I see a witness is being deceitful, or at least not being careful, and they're under oath, it upsets me.
>
> I don't know if I want to say much more than that. I don't know if I want to say I'm sorry, because I don't know if I'm really sorry. I think she needed to understand how important this court-martial is. Not only to [Appellant], who of course it is. He's sitting here facing a tsunami. But also to her daughter. So I think enough said. I don't think I need to say anything more.

Judge Milam then granted the delay requested by the Government. The court-martial recessed for the day shortly thereafter, and resumed the following morning.

### b. Military Judge's Questioning of Dr. DL

After the court members found Appellant guilty, during pre-sentencing proceedings the Defense called Dr. DL to testify as an expert witness in forensic psychology. On direct examination, Dr. DL testified that he used the Static-99R, an "actuarial instrument" with "10 items that are statistically related to increased risk for re-offense for a sexual offense," to estimate the likelihood that Appellant would reoffend. Dr. DL explained that Appellant's score on the Static-99R was two, on a scale of negative three (the lowest risk to reoffend) to 13 (the highest), which indicated an "average" risk of reoffending.[9] Dr. DL further explained that the Static-99R did "not reflect all relevant risk factors;" two such "dynamic" risk factors not measured by the Static-99R were whether the subject had an "antisocial orientation," or had "genuine sexual deviance . . . a documented paraphilia." Because Dr. DL assessed that neither antisocial orientation nor paraphilia were present in Appellant's case, in consideration of these factors he assessed Appellant was "at low risk to re-offend with any sexual offense."

After a brief cross-examination and redirect, Judge Milam took an 11-minute recess. When the trial resumed, Judge Milam questioned Dr. DL. In the course of his questioning Judge Milam inquired about two psychological tests Dr. DL had not mentioned in his earlier testimony and that were not otherwise entered in evidence. In addition, at one point during his questioning Judge Milam stated, "[I]t's difficult for me to accept that you can give an opinion after only meeting with somebody for about 90 minutes total as to what they're going to do in the future." In response, Dr. DL explained that the Static-99R could be used "without ever meeting with someone, and that's still felt to be valid. . . . So just from a purely statistical standpoint, I'm trying to tell you where [Appellant] falls." Judge Milam also expressed surprise at Dr. DL's testimony that pornography and child pornography did not have a correlation to the risk of reoffense.

### c. Military Judge's Comments after Sentencing Argument

During his sentencing argument, trial defense counsel opined "[s]urely this court is troubled with [Appellant's] conduct," but asserted Appellant trusted the military judge would not "sentence [him] in anger . . . when emotions are high," "[s]entence him according to what's objectively right, and not necessarily

---

[9] According to Dr. DL, the Static-99R factors that increased the risk of re-offense were Appellant's age (under 35 years) and that the victim was not a member of Appellant's household.

based on passion or emotion," and "not according to enflamed passions or anything like that." Prior to closing the court to deliberate on the sentence, Judge Milam commented:

> I do want to address one brief thing, and that is that I'm not angry. I'm not passionate over this. I'm not emotional. So just to make that very clear, that - well, the only thing I'll say is it's a very difficult job to do, not that I want anybody's sympathy, but just in general to sit in judgment over someone else. So but - so I don't take that lightly. I'll put that out there. But I also - I'm not angry about what [Appellant] was convicted of, or passionate about it, or emotional about it. So I think enough said.

### d. Post-Trial Motion for Mistrial

At no point during the trial did the Defense move for a mistrial or move or request that Judge Milam recuse himself. However, after Judge Jimenez had been designated to complete the entry of judgment in the case,[10] on 26 December 2019 the Defense moved Judge Jimenez to declare a mistrial. The motion cited Judge Milam's "tone, demeanor, and questioning" of both Ms. W and Dr. DL as revealing "an apparent bias or partiality." In addition, the Defense cited Judge Milam's "new line of questioning" with Dr. DL "that included diagnostic tools used to predict recidivism in the field of forensic psychology that appeared to be the result of outside research he conducted during the recess." The Government opposed the motion for mistrial. Judge Jimenez heard argument on the motion during a 3 February 2020 post-trial Article 39(a), UCMJ, hearing.

On 9 February 2020, Judge Jimenez issued her written ruling denying the motion. Judge Jimenez found Judge Milam's questioning of Ms. W, "however inartful," in the context of the entire trial did not indicate bias or partiality but rather Judge Milam "sought an understanding of the witness'[s] actions to derive the underlying meaning – whether the victim's mother believed the victim when the victim first reported." Judge Jimenez found the trial judge was "tough" with Ms. W, "but not biased." With respect to Dr. DL, Judge Jimenez found no evidence Judge Milam's questioning was based on independent research or indicated partiality. Accordingly, Judge Jimenez found Judge Milam

---

[10] The Chief Trial Judge of the Air Force Trial Judiciary's memorandum dated 3 December 2019 detailing Judge Jimenez to the case indicated Judge Milam was "not reasonably available." A subsequent memorandum from the Chief Trial Judge dated 17 December 2019 detailed Judge Jimenez to "any post-trial Article 39(a), [UCMJ,] sessions that may be required in the case," because he found "there was good cause to detail a military judge, different from the military judge detailed for the trial."

was not disqualified and that "taken as a whole, the trial judge's questions do not put in doubt the court-martial's fairness, legality, and impartiality."

**2. Law**

We review a military judge's decision whether to recuse himself for an abuse of discretion. *United States v. Sullivan*, 74 M.J. 448, 454 (C.A.A.F. 2015). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citation omitted). However, "[w]hen an appellant . . . does not raise the issue of disqualification until appeal, we examine the claim under the plain error standard of review." *United States v. Martinez*, 70 M.J. 154, 157 (C.A.A.F. 2011) (citing *United States v. Jones*, 55 M.J. 317, 320 (C.A.A.F. 2001)). "Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice." *Id.* (citing *United States v. Maynard*, 66 M.J. 242, 244 (C.A.A.F. 2008)).

"An accused has a constitutional right to an impartial judge." *United States v. Wright*, 52 M.J. 136, 140 (C.A.A.F. 1999) (citations omitted). R.C.M. 902 governs disqualification of the military judge. R.C.M. 902(b) sets forth five specific circumstances in which a "military judge shall disqualify himself or herself." In addition, R.C.M. 902(a) requires disqualification "in any proceeding in which th[e] military judge's impartiality might reasonably be questioned." Disqualification pursuant to R.C.M. 902(a) is determined by applying an objective standard of "whether a reasonable person knowing all the circumstances would conclude that the military judge's impartiality might reasonably be questioned." *Sullivan*, 74 M.J. at 453 (citing *United States v. Hasan*, 71 M.J. 416, 418 (C.A.A.F. 2012)).

"There is a strong presumption that a judge is impartial, and a party seeking to demonstrate bias must overcome a high hurdle . . . ." *United States v. Quintanilla*, 56 M.J. 37, 44 (C.A.A.F. 2001) (citation omitted). "Although a military judge is to 'broadly construe' the grounds for challenge, he should not leave the case 'unnecessarily.'" *Sullivan*, 74 M.J. at 454 (quoting R.C.M. 902(d)(1) Discussion).

"[A] military judge must not become an advocate for a party but must vigilantly remain impartial during the trial." *United States v. Ramos*, 42 M.J. 392, 396 (C.A.A.F. 1995). However, "a military judge is not 'a mere referee' but, rather, properly may participate actively in the proceedings." *Id.* (quoting *United States v. Graves*, 1 M.J. 50, 53 (C.M.A. 1975)). "Thus, while a military judge must maintain his fulcrum position of impartiality, the judge can and sometimes must ask questions in order to clear up uncertainties in the evidence or

to develop the facts further." *Id.* (citations omitted); *see also* Mil. R. Evid. 614 (permitting the military judge to call and examine witnesses). However, "a military judge must be circumspect in what he says to the parties and in how he examines witnesses." *Ramos*, 42 M.J. at 396. "The legal test that flows [from a judge questioning a witness] is whether 'taken as a whole in the context of this trial,' a court-martial's 'legality, fairness, and impartiality' were put into doubt by the military judge's questions." *United States v. Acosta*, 49 M.J. 14, 18 (C.A.A.F. 1998) (citing *United States v. Reynolds*, 24 M.J. 261, 265 (C.M.A. 1987)).

"The military judge may, as a matter of discretion, declare a mistrial when such action is manifestly necessary in the interest of justice because of circumstances arising during the proceeding which casts substantial doubt upon the fairness of the proceedings." R.C.M. 915(a). "Declaration of a mistrial is a drastic remedy, and such relief will be granted only to prevent a manifest injustice against the accused." *United States v. Rushatz*, 31 M.J. 450, 456 (C.M.A. 1990) (citation omitted). "[A] mistrial is an unusual and disfavored remedy" that "should be applied only as a last resort to protect the guarantee of a fair trial." *United States v. Diaz*, 59 M.J. 79, 90 (C.A.A.F. 2003). We review a military judge's ruling on a motion for mistrial for a clear abuse of discretion. *United States v. Coleman*, 72 M.J. 184, 186 (C.A.A.F. 2013) (citation omitted).

"[N]ot every judicial disqualification error requires reversal." *Martinez*, 70 M.J. at 158 (citation omitted). Appellate courts consider three factors to determine whether a disqualification error warrants a remedy: (1) the risk of injustice to the parties; (2) the risk that denial of relief will produce injustice in other cases; and (3) the risk of undermining public confidence in the judicial process. *United States v. McIlwain*, 66 M.J. 312, 315 (C.A.A.F. 2008) (citing *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 864 (1988)) (additional citations omitted).

### 3. Analysis

Appellant's asserts both that Judge Milam abused his discretion by failing to recuse himself *sua sponte* and that Judge Jimenez abused her discretion by denying the post-trial mistrial motion. We address each contention in turn.

Although the Defense's post-trial motion for mistrial cited Judge Milam's examination of both Ms. W and Dr. DL, on appeal, Appellant focuses on Judge Milam's questioning and comments with respect to Ms. W. Appellant asserts Judge Milam's behavior prejudiced him because Judge Milam's evident bias against Ms. W caused Judge Milam to disregard elements of Ms. W's testimony purportedly helpful to the Defense. Appellant alternatively suggests that once this bias was exposed on the record, Judge Milam yielded to government arguments for conviction and a severe sentence in an effort to dispel any notion that

he was biased against the Government. Appellant further contends that even if Judge Milam was not actually biased, his apparent hostility to Ms. W was sufficient to disqualify him and infringed Appellant's right to a fair trial. Accordingly, Judge Milam's interaction with Ms. W is the primary focus of our analysis.

### a. Judge Milam's Failure to Recuse

### i. Standard of Review

As an initial matter, Appellant forfeited his claim that Judge Milam was disqualified by failing to object or move for Judge Milam's recusal during the trial itself. On appeal, Appellant contends that although he did not raise the issue before Judge Milam, he did raise it "while the case was still pending at the trial level"—that is, during the post-trial phase before entry of judgment. Regardless of the reason, the basis for Appellant's present claim of disqualification was events that occurred on the record at the time of trial of which the Defense was aware at the time. The failure to timely assert a known right forfeits the issue, *see United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009) (citation omitted), and the time to object to Judge Milam's continued participation in the court-martial was when the Defense became aware of the basis for the alleged disqualification. Accordingly, we review Judge Milam's failure to recuse himself *sua sponte* for an abuse of discretion under the plain error standard.

### ii. Judge Milam's Questions Regarding "Parenting"

Appellant first takes issue with some of Judge Milam's initial questions of Ms. W which related to what Ms. W would normally do when MW spent the night at someone else's house. Ms. W testified, *inter alia*, that she would not check MW's overnight bag, would typically not speak with MW after dropping her off, and would not typically ask who else was going to be present at the house. Appellant contends these questions were "relevant *only* to whether [Ms. W] was a good mother, and it was clear from the answers thereto that Judge [Milam] thought she was not." We disagree that the only possible relevance of such questions had to do with Judge Milam's assessment of whether Ms. W was a "good mother." For example, such questions could help the military judge determine whether some of MW's testimony—such as that MW had not brought a change of clothes to Appellant's house—was credible or accurate, whether the plan for MW to spend the night was spontaneous or prearranged, and whether the lack of contact between MW and Ms. W on the night of the offense was typical or unusual. We do not find this line of questioning tends to undermine the strong presumption the military judge was impartial.

### iii. Judge Milam's Questions Regarding Ms. W's Husband

Appellant contends Judge Milam's questions regarding why Ms. W delayed telling her husband about the offense reveal it was "obvious" that he "disapproved of the fact that MW's father was the last to know." Appellant discounts Judge Milam's explanation that he was asking these questions in order to determine whether MW was telling the truth, "because whether [Ms. W] believed MW's allegation is irrelevant." Instead, Appellant asserts, the "real reason" for these questions was Judge Milam's disapproval of Ms. W's actions.

Appellant has characterized this portion of Judge Milam's examination as "one censorious question after another calculated to affront her dignity as a parent and a spouse," and argues this "depriv[ed] Appellant of a fair trial in the process." At this stage of the trial, Judge Milam had heard testimony from two government witnesses that was inconsistent in certain respects. He was required to assess their credibility, and Ms. W's testimony regarding what she did after MW initially informed her of the incident would reasonably inform a factfinder's determination of the believability of that testimony. To be sure, Judge Milam expressed skepticism at certain aspects of Ms. W's testimony, and he seemingly demonstrated a degree of frustration when he perceived Ms. W's testimony had been inconsistent with other out-of-court statements she had made. However, a military judge—like any factfinder—is not obligated to accept the testimony of any given witness at face value as being credible, nor is a military judge sitting as a court-martial prohibited from probing witnesses in forming an opinion as to what weight to give their testimony. While we acknowledge some of Judge Milam's questions and comments at this stage appear confrontational, disapproving, and of questionable relevance, we are not persuaded his questioning demonstrates he was not impartial such as to prejudice either Appellant's right to a fair trial or lead a reasonable person to question his impartiality toward the parties.

### iv. Judge Milam's Second Examination of Ms. W

Judge Milam's final line of questioning of Ms. W, after additional redirect and recross-examination, was of a different character to what had come before. Essentially, Judge Milam scolded Ms. W for providing what he interpreted as inconsistent testimony under oath. Ensuring witnesses understand the seriousness of court-martial proceedings and the obligation to testify truthfully is a worthy endeavor for a military judge; however, we do not indorse Judge Milam's extremely blunt and frankly humiliating treatment of Ms. W at this point, using the specific example of what appears to be a relatively minor discrepancy in her testimony. By Judge Milam's own later description he had become "upset" at this point because he perceived Ms. W was being "deceitful, or at least not being careful" while testifying under oath.

However, even if we accept that Judge Milam had developed a negative view of Ms. W as a witness, we are not persuaded this resulted in actual or

apparent bias that prejudiced Appellant's right to a fair trial. "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky v. United States*, 510 U.S. 540, 555 (1994). In this case, Ms. W was neither a party nor counsel for a party, simply a witness—and a prosecution witness at that. A reasonable observer would have noted it was the Government, not the Defense, that appeared consternated by Judge Milam's behavior. On the contrary, trial defense counsel professed readiness to proceed with the trial and at no point during the trial itself challenged Judge Milam's impartiality.

Appellant acknowledges the Government's reaction to Judge Milam's questioning, and contends this response actually indicates the resulting alleged bias against Appellant. Appellant contends that after the Government requested an extended recess in response to the "unexpected" manner of Judge Milam's questioning of Ms. W, Judge Milam "knew he had a problem" that he needed to "address." Appellant suggests Judge Milam's subsequent comments regarding the witness "not being careful" with her testimony indicate he "blam[ed] Ms. W for his own loss of deportment." Appellant goes further, and contends that in order to avoid the appearance of bias against Ms. W, he "bent over backwards to make it seem as though he ha[d] not acted as a result of such bias"—presumably by favoring the Government's case at the Defense's expense. *Quintanilla*, 56 M.J. at 43–44 (citation omitted). We disagree with Appellant's characterization of Judge Milam's subsequent comments, which appeared to be more of an exposition of his frustration with Ms. W's testimony than a statement of contrition. In any event, such sheer speculation on Appellant's part does not overcome the strong presumption the military judge remained unbiased *with respect to the parties* and adhered to his duty to decide the case impartially. Moreover, the mere fact that Judge Milam found Appellant guilty based on what this court has determined to be legally and factually sufficient evidence surely does not overcome that presumption.

### v. Conclusion with Regard to Failure to Recuse Sua Sponte

For the foregoing reasons, we find Appellant has failed to demonstrate Judge Milam plainly or obviously erred by failing to recuse himself *sua sponte* from Appellant's trial.

### b. Judge Jimenez's Denial of the Motion for Mistrial

We first address the Government's claim that Judge Jimenez "lacked authority" to review the Defense's "untimely motion" for a mistrial. The Government contends that under R.C.M. 1104(b)(2)(A), the Defense was required to file such a post-trial motion within 14 days of trial defense counsel's receipt of the Statement of Trial Results (STR). Because trial defense counsel received

the original STR in September 2019, the Government reasons, the 27 December 2019 mistrial motion was out of time. Moreover, the Government further argues that under R.C.M. 1104(a) there is "no vehicle to consider newly raised motions which properly should have been raised during the court-martial."

For several reasons, we decline the Government's suggestion that this court should "pierce" Judge Jimenez's ruling on the mistrial motion and limit ourselves to the plain error review of Judge Milam's failure to recuse himself, addressed above. First, we note the original STR the Government refers to was subsequently withdrawn and replaced by Judge Jimenez on 13 February 2020; in that sense, the mistrial motion was filed far in advance of the deadline. Second, when it responded to the motion the Government neither claimed that the motion was untimely nor that the military judge lacked the authority to decide it—in effect forfeiting the objection the Government now seeks to raise. Third, Article 66, UCMJ, 10 U.S.C. § 866, confers upon a Court of Criminal Appeals the authority to address legal errors, notwithstanding an appellant's failure to assert them, and to approve only so much of the findings and sentence as it finds, on the basis of the entire record, should be approved. *See* 10 U.S.C. § 866(d)(1)(A); *United States v. Hardy*, 77 M.J. 438, 443 (C.A.A.F. 2018).

Accordingly, we have reviewed Judge Jimenez's denial of the post-trial motion for mistrial, including the Defense's contentions regarding Judge Milam's questioning of Dr. DL as well as Ms. W, for an abuse of discretion. We find none. With regard to Ms. W, we find the record generally supports Judge Jimenez's decision for the reasons set forth in our analysis above. With regard to Dr. DL, we agree with Judge Jimenez that Judge Milam's brief references to the two psychological tests Dr. DL had not employed suggest the accumulated knowledge of an experienced military judge rather than the results of inappropriate independent research or an attempt to inject extraneous matters to Appellant's court-martial. Similarly, Judge Milam's questions to Dr. DL, although they might have indicated surprise or even some skepticism regarding the testimony, do not suggest unfair bias or partiality. Accordingly, Appellant is entitled to no relief from Judge Jimenez's ruling on the mistrial motion.

## C. Ultimate Issue and Human Lie Detector Testimony

### 1. Additional Background

#### a. Ms. W's Testimony

As described above with regard to the issue of Judge Milam's asserted disqualification, Judge Milam questioned Ms. W directly regarding her actions following MW's disclosure that Appellant had touched MW inappropriately. When Judge Milam asked Ms. W why she spoke with the school "psychiatrist" before she went to the police, Ms. W responded that it was "a huge allegation" and she felt like she needed "help" and "direction" for herself and MW. Judge

Milam then asked Ms. W, "[i]f you think a crime has been committed, who do you go to? A psychiatrist, or the police?" Ms W. responded, "Okay --" before Judge Milam continued, "Do you think what happened to your daughter is a crime?" Ms. W responded, "Yes." Neither the Government nor the Defense objected to this testimony. Judge Milam then moved on to a different topic, the substance of Ms. W's statement to the Belgian police.

### b. Dr. HR's Testimony

During the testimony of Dr. HR, the Government's expert in forensic psychology and pediatric forensic psychology, trial counsel asked several questions regarding confabulation of memory. Dr. HR described "confabulation" as "anything that might contaminate a memory and make that memory less than what it would be if it had been recorded on a DVD." Trial counsel's direct examination included the following:

> Q. [Circuit Trial Counsel] But let's talk about it in terms of [MW]. You were in - were you in here when she testified on Monday?
>
> A. [Dr. HR] Yes.
>
> Q. And did you hear her describe the details of the accused touching her?
>
> A. Yes.
>
> Q. But isn't it - isn't it possible that [MW] herself had confabulation on her memories with respect to what happened on the couch? Isn't it possible?
>
> A. In terms of getting - you know - confabulation to be like getting the memory wrong or getting multiple events and crunch them into a single memory, or a time - maybe getting the events confused. Is that possible? Yes, that is possible. But it is very unlikely with those specific memories.
>
> Q. Why is it unlikely?
>
> A. When we are having memories of something, and it doesn't necessarily have to be traumatic, but it's something that is so out of the ordinary, it's concerning, it's frightening, and it's so unusual that it tends to stick out in our mind, the salient pieces of that memory are what the brain holds onto, and that is much - that is much more resistant to memory contamination than the superfluous influences. . . .

Dr. HR then gave a specific example of his personal memory of President Kennedy's assassination. He then agreed that his testimony was his "professional

opinion based on the complete body of information [he had] been able to review as part of this case."

On cross-examination, among other questions, trial defense counsel asked Dr. HR whether it was possible that MW was "taking [memories] that occurred over a longer period of time and compressing them into a shorter period of time." Dr. HR agreed that was "a possibility." On redirect examination, trial counsel asked Dr. HR whether such "memory compression" was likely in this case. Dr. HR opined it was not likely for two reasons. First, he explained that MW "was discussing and reporting the specific events that let her know that something out of the ordinary was happening to her;" second, he explained that compression of memories is "typically something that we do over time" that does not happen "immediately."

Trial defense counsel did not object to Dr. HR's testimony regarding confabulation and compression of memories.

### c. HB's Testimony

The Government called Appellant's stepdaughter HB to testify during its case-in-chief. HB testified *inter alia* to her memory of the events leading up to the charged offense to the point that she fell asleep on the sofa, and of events afterwards, including speaking to MW at school about the incident. HB agreed that when she was interviewed by the "police" about the allegations against Appellant, she told them she "didn't know who accused [Appellant]." However, HB then agreed that she "knew [MW] was saying things that could have gotten [Appellant] in trouble." Trial counsel then asked HB several questions as to whether telling a partial truth is "also a lie," to which HB responded that "it depends," and it was not a lie but "it's like it's not the whole thing."

At the conclusion of the direct examination, trial counsel asked, "You and [MW] were pretty close friends. Do friends lie?" HB responded, "No." Trial defense counsel did not object to this question or answer.

### 2. Law

We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *United States v. Bowen*, 76 M.J. 83, 87 (C.A.A.F. 2017) (citation omitted). "When the defense fails to object to the admission of specific evidence," we review for plain error. *United States v. Maynard*, 66 M.J. 242, 244 (C.A.A.F. 2008); *see also United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017) (distinguishing forfeiture from waiver) (citations omitted).

A witness not testifying as an expert may offer testimony in the form of an opinion only if the testimony is: "rationally based on the witness' perception;" "helpful to understanding the witness' testimony or to determining a fact in issue;" and "not based on scientific, technical, or other specialized knowledge

within the scope of Mil. R. Evid. 702." Mil. R. Evid. 701. A witness qualified as an expert may testify in the form of an opinion if: their "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" "the testimony is based on sufficient facts or data;" "the testimony is the product of reliable principles and methods;" and "the expert reliably applied the principles and methods to the facts of the case." Mil. R. Evid. 702; *see also United States v. Billings*, 61 M.J. 163, 166 (C.A.A.F. 2005) (explaining factors for evaluating expert qualifications). "An opinion is not objectionable just because it embraces an ultimate issue." Mil. R. Evid. 704. However, "[i]t is generally held . . . that opinion testimony is not helpful where it does no more than instruct the factfinder as to what result it should reach." *United States v. Littlewood*, 53 M.J. 349, 353 (C.A.A.F. 2000) (citations omitted).

"Human lie detector testimony is elicited when a witness provides 'an opinion as to whether [a] person was truthful in making a specific statement regarding a fact at issue in the case.'" *United States v. Martin*, 75 M.J. 321, 324 (C.A.A.F. 2016) (quoting *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014)). "If a witness does not expressly state that he believes a person is truthful, we examine the testimony to determine if it is the 'functional equivalent of' human lie detector testimony.'" *Id.* (citing *United States v. Brooks*, 64 M.J. 325, 329 (C.A.A.F. 2007)).

> Testimony is the functional equivalent of human lie detector testimony when it invades the unique province of the court members to determine the credibility of witnesses, and the substance of the testimony leads the members to infer that the witness believes the victim is truthful or deceitful with respect to an issue at trial.

*Id.* at 324–25 (citing *United States v. Mullins*, 69 M.J. 113, 116 (C.A.A.F. 2010) (additional citation omitted)). Human lie detector evidence and its functional equivalent are inadmissible at a court-martial. *See id.* at 325 (citing *Knapp*, 73 M.J. at 36).

"For a nonconstitutional error . . . , the Government has the burden of demonstrating that 'the error did not have a substantial influence on the findings.'" *United States v. Berry*, 61 M.J. 91, 97 (C.A.A.F. 2005) (quoting *United States v. McCollum*, 58 M.J. 323, 342 (C.A.A.F. 2003)) (additional citation omitted). "In evaluating whether erroneous admission of Government evidence is harmless, this court uses a four-part test, weighing: (1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question." *Id.* at 98 (citation omitted).

"Military judges are presumed to know the law and to follow it absent clear evidence to the contrary." *United States v. Erickson*, 65 M.J. 221, 225 (C.A.A.F. 2007) (citing *United States v. Mason*, 45 M.J. 483, 484 (C.A.A.F. 1997)). "When the issue of plain error involves a judge-alone trial, an appellant faces a particularly high hurdle." *United States v. Robbins*, 52 M.J. 455, 457 (C.A.A.F. 2000). This is because a "military judge is presumed to know the law and apply it correctly, is presumed capable of filtering out inadmissible evidence, and is presumed not to have relied on such evidence on the question of guilt or innocence." *Id.* (citation omitted). Therefore, "plain error before a military judge sitting alone is rare indeed." *Id.* (quoting *United States v. Raya*, 45 M.J. 251, 253 (C.A.A.F. 1996)).

### 3. Analysis

Appellant asserts the military judge committed plain error by admitting the testimony of Ms. W, Dr. HR, and HB described above, which, he asserts, was either impermissible opinion testimony embracing the ultimate issue of Appellant's guilt or the functional equivalent of human lie detector testimony. We consider each witness's testimony in turn.

### *a. Ms. W's Testimony Whether She Thought there was a "Crime"*

Appellant contends the military judge improperly elicited Ms. W's opinion that "what happened to [MW] was a crime." He argues Ms. W's testimony fails the Mil. R. Evid. 701 criteria for lay opinion testimony because it was neither based on Ms. W's own perception, as she had no first-hand information of the alleged offense, and because it was not helpful to the determination of a fact in issue, as Ms. W's opinion regarding the ultimate issue was irrelevant. Appellant cites Judge Milam's explanation to Ms. W that he was questioning her in order to determine whether MW was telling the truth, which, Appellant asserts, indicates Judge Milam was attempting to determine whether Ms. W believed MW.

We are not persuaded the military judge's elicitation of this testimony was plain or obvious error. In context, it appears the military judge was not substantively interested in Ms. W's opinion on Appellant's guilt. Instead, as discussed above in relation to the issue of disqualification, the military judge could find Ms. W's actions after MW told her of the inappropriate touching to be relevant in understanding the testimony and assessing the credibility of MW and Ms. W herself. The military judge might more precisely have asked Ms. W whether she thought what MW told her in the car, if true, would have been a crime, in order to understand why she acted as she did in the following days. However, in the absence of any objection, and in context, we do not find the military judge's question as asked was plainly or obviously "arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. McElhaney*,

54 M.J. 120, 130 (C.A.A.F. 2000) (citations omitted); *see Martinez*, 70 M.J. at 157.

Furthermore, assuming for purposes of argument that the military judge clearly abused his discretion with regard to the form of his question and the answer elicited, we are not persuaded this testimony exerted a substantial improper influence on the findings. Military judges are presumed to know the law, and nothing in the record indicates to us the military judge misunderstood his responsibility to determine whether or not Appellant was guilty without relying on the opinions of others as to this ultimate issue. In light of this presumption and the nature of the testimony, any erroneous admission was of negligible materiality to the result of the trial. Specifically with regard to Ms. W, Appellant himself has contended at length how he believes the military judge demonstrated his low regard for Ms. W and her testimony. We are not persuaded Ms. W's testimony regarding her belief that what MW told her was a crime improperly influenced the military judge's verdict.

### b. Dr. HR's Testimony Regarding Confabulation and Memory Compression

Appellant argues Dr. HR's testimony regarding confabulation and memory compression were the functional equivalent of human lie detector testimony, because it would lead the military judge to infer Dr. HR believed MW's memories were real and, therefore, she was telling the truth. Appellant quotes *United States v. Birdsall* to argue that, as a result, Dr. HR put an "undeserved scientific stamp of approval on the credibility of the victim in this case." 47 M.J. 404, 410 (C.A.A.F. 1998). We disagree.

As an initial matter, we note trial defense counsel introduced the subject of memory compression, as distinct from confabulation, during cross-examination. Trial counsel's redirect examination that memory compression was unlikely in this case was in direct response to clarify trial defense counsel's elicitation that such compression was "possible." "The invited error doctrine prevents a party from 'creat[ing] error and then tak[ing] advantage of a situation of his own making [on appeal].'" *Martin*, 75 M.J. at 325 (alterations in original) (quoting *United States v. Eggen*, 51 M.J. 159, 162 (C.A.A.F. 1999)). Invited error provides no basis for relief. *Id.* (citations omitted). To the extent Appellant asserts on appeal that Dr. HR's testimony on redirect about memory compression was error, the Defense invited that testimony by introducing the topic.

More fundamentally, we find nothing erroneous, plainly or otherwise, in Dr. HR's testimony regarding confabulation and memory compression. Dr. HR did not testify as to whether or not he believed MW was telling the truth. Instead, he applied his scientific expertise to the available information and

opined that, under the circumstances of this case, the psychological phenomena of confabulation and memory compression were possible but not likely, and he explained why. The mere fact that Dr. HR's testimony might lead the trier of fact to conclude it was less likely that MW's testimony was the result of faulty memory, and by extension that her testimony was more likely to be accurate, does not make Dr. HR's testimony the functional equivalent of human lie detector testimony. If Dr. HR's testimony was scientifically unsound, trial defense counsel could have cross-examined him to that effect, or introduced competing testimony, but they did not.

We find the instant case entirely unlike *Birdsall*, which provides a paradigmatic example of impermissible human lie detector testimony by an expert witness. There, the witness

> expressly testified that the two boys in th[e] case were victims of incest by their father, appellant[; . . .] made clear that her opinion in this regard was based in large part on the statements made by the boys concerning the alleged acts of their father[; and] prefaced this testimony with an assertion that she was qualified to distinguish between founded and unfounded cases of child sexual abuse.

*Birdsall*, 47 M.J. at 410. In Appellant's case, Dr. HR did nothing of the kind. He offered no opinion as to whether MW's testimony was actually true, only that, based on scientific principles, it was unlikely to be the result of confabulated or compressed memory.

Moreover, the military judge is presumed to know the law, and assuming *arguendo* Dr. HR's testimony might be misinterpreted as an opinion that MW's testimony was truthful, we presume the military judge would not have interpreted it or improperly used it in such a manner.

Accordingly, we conclude Appellant has failed to demonstrate error, much less plain or obvious error, with respect to Dr. HR's testimony.

### c. HB's Testimony Regarding Whether Friends Lie

Appellant contends trial counsel's elicitation of HB's testimony that friends do not lie was the functional equivalent of human lie detector testimony because "since HB and MW were friends, and friends don't lie, MW must be telling the truth and HB believes the allegation." Again, we are not persuaded Appellant has met his burden to obtain relief for plain error.

We do not find the military judge's failure to exclude this testimony *sua sponte* was a plain or obvious abuse of discretion. We acknowledge the testimony is susceptible to the interpretation Appellant gives it—that the question

was intended to bolster the credibility of MW's testimony. However, HB's testimony that *in general* friends do not lie was not necessarily an indorsement that HB believed MW's allegation was truthful in the context of HB's entire testimony. HB's testimony as a whole did not convey that she believed MW's testimony.

In addition, the military judge could have interpreted and considered HB's testimony that friends do not lie in order to evaluate HB's own testimony as to whether she had lied or failed to tell the entire truth to the police regarding what she knew about the incident involving MW. Viewed in this context, the testimony was relevant to evaluate HB's own testimony and credibility as a witness, not as a comment on MW's testimony. For these reasons, we are not persuaded HB's testimony plainly or obviously "invade[d] the unique province" of the military judge as trier of fact to determine the credibility of MW's testimony. *Martin*, 75 M.J. at 324–25.

Moreover, assuming for purposes of analysis that HB's testimony was improper, we note once again that the military judge is presumed to know and follow the law, and would not have used such testimony for an improper purpose. Accordingly, Appellant has failed to demonstrate any such error substantially influenced his conviction, or, therefore, that he is entitled to relief for plain error.

## D. Convening Authority Decision on Action

### 1. Additional Background

The convening authority referred the Charge and Specification to trial by general court-martial on 30 May 2019. Appellant's court-martial concluded on 12 September 2019 when Judge Milam sentenced Appellant to a dishonorable discharge, confinement for two years, reduction to the grade of E-1, and a reprimand. On 26 September 2019, Appellant through counsel requested deferment of the adjudged confinement, adjudged reduction in grade, and automatic forfeitures, as well as waiver of automatic forfeitures. Trial defense counsel secured an extension until 2 October 2019 for submission of clemency matters to the convening authority. However, evidently no such matters were submitted by the deadline, although the record contains a memorandum dated 16 October 2019 from trial defense counsel to "All Reviewing Authorities" regarding "Clemency Matters." Therein, trial defense counsel acknowledges "the convening authority's options concerning both the findings and sentence are limited in this case," and does not request any specific sentence relief, but expresses *inter alia* "some concern about the sufficiency of the evidence."

The convening authority's final decision on action dated 20 March 2020[11] waived automatic forfeitures effective 26 September 2019 for a period of six months or until expiration of Appellant's term of service, whichever occurred sooner, for the benefit of Appellant's spouse and dependent children. In addition, the convening authority provided the language of the adjudged reprimand. However, the convening authority did not approve the requested deferments, and he "determined not to take additional action on the sentence in this case." On 1 April 2020, Judge Jimenez signed the entry of judgment which reflected the convening authority's waiver of automatic forfeitures and the reprimand language.

**2. Law and Analysis**

The Charge and Specification were referred to trial after 1 January 2019; therefore, the Rules for Courts-Martial that went into effect on 1 January 2019 were generally applicable to the post-trial processing of Appellant's case. *See* Executive Order 13,825, § 5, 83 Fed. Reg. at 9890. However, the charged offense occurred prior to 1 January 2019. Therefore, in accordance with Executive Order 13,825, § 6, the version of Article 60, UCMJ, 10 U.S.C. § 860, in effect prior to 1 January 2019 applied to the convening authority to the extent that it required him to take action on the sentence. 83 Fed. Reg. at 9890; *see United States v. Brubaker-Escobar*, ___ M.J. ___, No. 20-0345, 2021 CAAF LEXIS 818, at *5–6 (C.A.A.F. 7 Sep. 2021) (per curiam). As the United States Court of Appeals for the Armed Forces (CAAF) has explained, that version of Article 60, UCMJ,

> states that "[a]ction on the sentence of a court-martial *shall* be taken by the convening authority." [ ] Therefore, in any case where an accused is found guilty of at least one specification where the offense was committed before January 1, 2019, a convening authority errs if he fails to take one of the following mandated post-trial actions in a case: approve, disapprove, commute, or suspend the sentence of the court-martial in whole or in part.

*Brubaker-Escobar*, 2021 CAAF LEXIS 818, at *6 (citing Article 60(c)(2)(A) and (B), UCMJ). Accordingly, the convening authority erred when he failed to approve, disapprove, commute, or suspend the elements of Appellant's sentence.

However, for cases such as Appellant's which were referred on or after 1 January 2019, such an error is procedural rather than jurisdictional, and we therefore test it for material prejudice to the appellant's substantial rights. *Id.* at *7–8 (citing 10 U.S.C. § 859(a) (2018); *United States v. Alexander*, 61 M.J.

---

[11] The convening authority issued his original decision on action on 6 November 2019, but that document was subsequently replaced.

266, 269 (C.A.A.F. 2005)). We do not find such prejudice in the instant case. The convening authority had no power to disapprove, commute, or suspend the findings of guilty, the dishonorable discharge, or the adjudged confinement. *See* 10 U.S.C. § 860a; R.C.M. 1109. The convening authority did have the power to modify the reduction in grade and reprimand; however, Appellant did not request such relief. The convening authority did have the power to defer Appellant's confinement, reduction in rank, and automatic forfeitures, which Appellant did request. However, despite specifically acknowledging the requests, the convening authority declined to defer imposition of these penalties. Nothing about the circumstances of this case suggest that the convening authority would have been more inclined to grant additional relief had he known that he was *required* to take action on the sentence, rather than merely having the *opportunity* to take action on the sentence.

Appellant contends the Decision on Action memorandum contains an error which indicates possible prejudice to his substantial rights. Specifically, Appellant notes the convening authority stated "[t]he accused did not submit any matters for my consideration on action under [R.C.M.] 1106," which Appellant contends is "clearly" wrong because trial defense counsel's 16 October 2019 "Clemency Matters" memorandum is in the record. We agree with the Government that the convening authority's statement, although imprecise, was not substantively inaccurate. Trial defense counsel's submission was evidently untimely, and therefore the convening authority was not obligated to consider it. *See* R.C.M. 1106(e)(1) ("Failure to submit matters within the time prescribed by this rule waives the right to submit such matters."). Furthermore, we perceive no prospect that trial defense counsel's memorandum, which did not request any sentence relief, might have persuaded the convening authority to take more favorable action with respect to the reduction, reprimand, or deferment requests.

Accordingly, we conclude the convening authority's error in failing to take action on the sentence did not materially prejudice Appellant's substantial rights, and does not warrant relief.

**E. Deferment Requests**

**1. Additional Background**

Appellant was sentenced on 12 September 2019, and trial defense counsel received the original STR on 17 September 2019. On 26 September 2019, trial defense counsel submitted a request that the convening authority defer the adjudged confinement, reduction in grade, and automatic forfeitures until entry of judgment pursuant to Article 57(b), UCMJ, 10 U.S.C. § 857(b), as well as waiver of automatic forfeitures pursuant to Article 58b(b), UCMJ, 10 U.S.C. § 858b(b). Trial defense counsel contended the factors to be weighed in deciding

deferment requests identified in R.C.M. 1103(d)(2) favored deferring confinement and reduction, and that the deferments would financially benefit Appellant's dependent spouse and three children.

In his initial Decision on Action memorandum dated 6 November 2019, the convening authority waived the automatic forfeitures for a period of six months or until release from confinement or the expiration of Appellant's term of service, whichever occurred first, effective 26 September 2019, for the benefit of Appellant's spouse and dependent children. The convening authority acknowledged Appellant's 26 September 2019 deferment requests; however, he neither granted nor expressly denied them. Instead, he stated "[i]n an effort to provide financial assistance to [Appellant's] dependents, I am waiving the automatic forfeitures as indicated . . . above."

On 3 December 2019, the Chief Trial Judge of the Air Force Trial Judiciary detailed Judge Jimenez to complete the entry of judgment in Appellant's case. Judge Jimenez identified an error in the original STR, which led her to convene a post-trial Article 39(a), UCMJ, hearing on 3 February 2020. On 28 February 2020, trial defense counsel submitted a "Request for Relief" memorandum which requested the convening authority "take any action within his authority to provide relief to [Appellant] for the benefit of his dependents," without specifically referring to deferment.

The convening authority signed a second Decision on Action memorandum dated 20 March 2020 which included the same language as the 6 November 2019 memorandum regarding waiver of automatic forfeitures and the requested deferments. In addition, the second memorandum contained the following: "On 28 February 2020, [Appellant], through his defense counsel, submitted a request for relief for the benefit of his dependents. I have determined not to take additional action on the sentence in this case." Judge Jimenez entered the judgment of the court-martial on 1 April 2020.

### 2. Law

Article 57(b)(1), UCMJ, 10 U.S.C. § 857(b)(1), authorizes a convening authority, "in his or her sole discretion" upon application by the accused, to defer the effective date of a sentence of confinement, reduction in grade, or forfeitures until the date the military judge enters the judgment of the court-martial. R.C.M. 1103(d)(2) provides that an accused seeking to have a punishment deferred "shall have the burden of showing that the interests of the accused and the community in deferral outweigh the community's interests in imposition of the punishment on its effective date." The rule outlines several factors which the convening authority may consider in determining whether to grant

the request.[12] "When a convening authority acts on an [appellant]'s request for deferment of all or part of an adjudged sentence, the action must be in writing (with a copy provided to the [appellant]) and must include the reasons upon which the action is based." *United States v. Sloan*, 35 M.J. 4, 7 (C.M.A. 1992), *overruled on other grounds by United States v. Dinger*, 77 M.J. 447, 453 (C.A.A.F. 2018). We review a convening authority's denial of a deferment request for an abuse of discretion. R.C.M. 1103(d)(2); *Sloan*, 35 M.J. at 6 (citation omitted).

In general, post-trial motions to address alleged errors in the post-trial processing of a court-martial "shall be filed not less than 14 days after defense counsel receives the Statement of Trial Results," subject to extension by the military judge for good cause. R.C.M. 1104(b)(2)(A). However, a "motion to correct an error in the action of the convening authority shall be filed within five days after the party receives the convening authority's action." R.C.M. 1104(b)(2)(B). "[F]orfeiture is the failure to make the timely assertion of a right." *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). We review forfeited issues for plain error. *Id.* (citing *United States v. Harcrow*, 66 M.J. 154, 156 (C.A.A.F. 2008)).

### 3. Analysis

Appellant contends, and the Government concedes, that the convening authority's failure to state his reasons for not granting the requested deferments was an error in light of *Sloan*. However, the parties disagree as to whether the error warrants any relief.

As an initial matter, we note that Appellant did not submit a motion pursuant to R.C.M. 1104 or otherwise object prior to entry of judgment to the convening authority's failure to give reasons for his decision, despite having an extended opportunity to do so. Accordingly, Appellant forfeited his objection.

---

[12] The listed factors include:

> [T]he probability of the accused's flight; the probability of the accused's commission of other offenses, intimidation of witnesses, or interference with the administration of justice; the nature of the offenses (including the effect on the victim) of which the accused was convicted; the sentence adjudged; the command's immediate need for the accused; the effect of deferment on good order and discipline in the command; the accused's character, mental condition, family situation, and service record.

R.C.M. 1103(d)(2).

Therefore, we review for plain error, under which standard Appellant bears the burden to demonstrate material prejudice to a substantial right. *United States v. Erickson*, 65 M.J. 221, 223 (C.A.A.F. 2007) (citations omitted).

Appellant contends the convening authority's limited explanation in his decision on action creates uncertainty as to "whether he even understood" that granting a waiver of automatic forfeitures and granting the requested deferments "were not mutually exclusive." Appellant contends this uncertainty meets the low threshold of a colorable showing of possible prejudice.[13] We disagree. We find no implication in the record that the convening authority misunderstood his power to grant the requested waiver and the deferments, had he found it appropriate to do so. Instead, we find the clear implication is that the convening authority determined that waiver of automatic forfeitures without the deferments was, under the circumstances, the appropriate provision for the financial needs of Appellant's dependents, and that no "additional action" with respect to the sentence was appropriate.

Additional considerations reinforce our conclusion that Appellant has failed to demonstrate prejudice in this case. Both the initial and final Decision on Action memoranda affirmatively indicate the convening authority was aware of Appellant's written deferment request, which included the legal basis and R.C.M. 1103(d)(2) factors for deciding such requests. Furthermore, as the Government notes, Appellant has not alleged the convening authority's decision was in fact an abuse of discretion under the applicable criteria. We find no indication the convening authority was motivated by an unlawful or improper reason,[14] and as indicated above he affirmatively considered and attempted to address the needs of Appellant's dependents. Considering the totality of the circumstances, we conclude no relief is warranted.

---

[13] We have recently applied the "colorable showing of possible prejudice" standard to a *Sloan* error where the Government conceded it was the applicable standard to assess prejudice. *United States v. Ward*, No. ACM 39648, 2020 CCA LEXIS 305, at *9–11 (A.F. Ct. Crim. App. 3 Sep. 2020) (unpub. op.), *rev. denied*, 80 M.J. 457 (C.A.A.F. 2020); *see also United States v. Jalos*, No. ACM 39138, 2017 CCA LEXIS 607, at *6 (A.F. Ct. Crim. App. 5 Sep. 2017) (unpub. op.) ("Even when there is error in the convening authority's action on a deferment request, relief is only warranted if an appellant makes a colorable showing of possible prejudice." (citations omitted)). The Government makes no such concession in Appellant's case. However, we again find it unnecessary to definitively resolve whether the "colorable showing" standard is the correct one; assuming for purposes of analysis that it applies, Appellant has failed to meet it.

[14] *See Ward*, unpub. op. at *11 n.4 (discussing *United States v. Zimmer*, 56 M.J. 869, 874 (A. Ct. Crim. App. 2002)).

### F. Post-Trial Delay

### 1. Additional Background[15]

The convening authority referred the Charge and its Specification for trial on 30 May 2019. The court-martial sentenced Appellant on 12 September 2019. Judge Milam signed the original STR on the same day. Appellant submitted his clemency matters to the convening authority on 16 October 2019, and the convening authority signed his original decision on action on 6 November 2019.

On 3 December 2019, Judge Jimenez was detailed to complete the entry of judgment in place of Judge Milam.[16] On 17 December 2019, Judge Jimenez identified a clerical error in the original STR, and set an Article 39(a), UCMJ, hearing for 3 January 2020 to be held via virtual telecommunication connection (VTC). On 26 December 2019, the Defense submitted its motion for a mistrial, as described above. Judge Jimenez and the parties attempted to hold the Article 39(a), UCMJ, hearing as scheduled on 3 January 2020, but the VTC connections failed. Judge Jimenez rescheduled the hearing for 3 February 2020, the next date trial defense counsel would be available, and the hearing took place via VTC on that date.

Judge Jimenez signed the corrected STR on 13 February 2020. According to a case chronology included with the record of trial, the convening authority's decision on action was delayed due to questions regarding the status of Appellant's pay, which involved: Appellant's wife; the office of the convening authority's staff judge advocate at Third Air Force at Ramstein Air Base (AB), Germany; legal and comptroller personnel at Spangdahlem AB, Germany; Appellant's first sergeant; and others. The convening authority signed the new Decision on Action memorandum on 20 March 2020, and Judge Jimenez signed the entry of judgment on 1 April 2020.

On 2 April 2020, the court reporter certified the record of trial as complete. However, the court reporter had not yet received all of the appellate exhibits from the post-trial proceedings, and did not receive them until 4 or 5 May 2020.[17] On 6 and 7 May 2020, the record was reassembled to incorporate these

---

[15] This additional background is drawn from material in the record of trial, as well as sworn declarations and other documents the Government moved to attach to the record. We find we may consider these additional documents in order to resolve an issue raised in the record. *See United States v. Jessie*, 79 M.J. 437, 442 (C.A.A.F. 2020).

[16] *See* note 10, *supra*.

[17] It is unclear why the court reporter certified the record as complete on 2 April 2020 when he had not received all of the required exhibits. *See* R.C.M. 1112(b), (c). However, this discrepancy, in itself, had little evident impact on the post-trial delay. Whether

exhibits. On 15 May 2020, the record arrived at the Third Air Force legal office, which reviewed the record with members of the Spangdahlem AB legal office on 20 May 2020. The record was mailed to the Appellate Records Branch of the Military Justice Law and Policy Division (JAJM) located at Joint Base Andrews, Maryland, on 8 June 2020, and was docketed with this court on 19 June 2020, 281 days after Appellant was sentenced.

### 2. Law

"[C]onvicted servicemembers have a due process right to timely review and appeal of courts-martial convictions." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citing *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004); *Diaz v. JAG of the Navy*, 59 M.J. 34, 37–38 (C.A.A.F. 2006)). In *Moreno*, the CAAF established a presumption of facially unreasonable delay when the convening authority does not take action within 120 days of sentencing or when the record of trial is not docketed with the Court of Criminal Appeals within 30 days of action. *Id.* at 142. In *United States v. Livak*, 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020), this court established an aggregated 150-day standard for facially unreasonable delay from sentencing to docketing with the Court of Criminal Appeals for cases referred to trial on or after 1 January 2019, in light of the new post-trial processing procedures that went into effect on that date.

Where there is such a facially unreasonable delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *Toohey*, 60 M.J. at 102). The CAAF identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) "particularized" anxiety and concern "that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision;" and (3) impairment of the appellant's grounds for appeal or ability to present a defense at a rehearing. *Id.* at 138–40 (citations omitted). "No single [*Barker*] factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533). However, where there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the

---

the court reporter certified the record prematurely or waited until the record was completely assembled, the record would not have been ready for further processing until 7 May 2020 in either case.

military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

We review de novo an appellant's entitlement to relief for post-trial delay. *Livak*, 80 M.J. at 633 (citing *Moreno*, 63 M.J. at 135).

### 3. Analysis

The 281 days that elapsed between Appellant's sentencing and the record's arrival at this court substantially exceeds the 150-day standard for facially unreasonable post-trial delay this court established in *Livak*. Accordingly, we have considered the factors set forth in *Moreno* to determine whether his due process rights were violated. We begin with a consideration of whether Appellant has been prejudiced by the delay. Where an appellant does not prevail on the substantive grounds of his appeal, as in this case, there is no oppressive incarceration. *Moreno*, 63 M.J. at 139. We discern no impairment to Appellant's grounds for appeal, and where an appellant's substantive appeal fails, his ability to present a defense at a rehearing is not impaired. *Id.* at 140.[18]

With regard to anxiety and concern, "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id.* Appellant did not initially allege a violation of his due process rights in his assignments of error, and did not allege that he had been prejudiced by delay. After this court *sua sponte* ordered the Government to address the facially unreasonable post-trial delay, Appellant submitted and this court accepted a sworn declaration regarding the delay. In his declaration, Appellant addresses: reasons behind the confusion surrounding his pay, evidently related to his having obtained advance payment and to the expiration of his term of service; the stress and frustrations experienced by his spouse during the post-trial process; and his hopes and disappointment related to the post-trial hearing held by Judge Jimenez. However, although Appellant's post-trial circumstances were in some ways atypical in that they involved a post-trial Article 39(a), UCMJ, hearing ordered by the military judge, and required his family to return to the United States from overseas, Appellant fails to associate particularized anxiety and concern—distinguishable from that experienced by other appellants awaiting decisions on their cases—with periods of delay primarily attributable to the Government, as described below. Accordingly, we do not find Appellant has demonstrated the sort of particularized cognizable prejudice the CAAF identified in *Moreno*.

---

[18] As the Government notes, the Defense took advantage of the delay in order to file its post-trial motion for a mistrial with the new military judge.

In the absence of such prejudice, a due process violation would exist only if the delay were so egregious as to undermine the perception of fairness and integrity in the military justice system. Under the circumstances of this case, we find it is not. Although the delay was considerable, we note much of it was largely attributable to the judiciary rather than directly to the Government. Examples of such delay include: the replacement of Judge Milam by Judge Jimenez at the direction of the Chief Trial Judge of the Air Force Trial Judiciary; the error in the original STR, signed by Judge Milam, which resulted in the post-trial Article 39(a), UCMJ, hearing; and Judge Jimenez's decision that such a hearing was required in order to address the erroneous STR. In addition, the duration of the delay between the attempted 3 January 2020 hearing and the successful 3 February 2020 hearing was primarily due to trial defense counsel's availability. The Defense's decision to raise its post-trial motion for mistrial may have also contributed to the delay, albeit marginally, by extending the scope of the post-trial hearing and increasing the number of related appellate exhibits.

Other later delays in the process are less well-explained or justified from the Government's perspective. For example, it is unclear why receipt of the appellate exhibits from counsel was delayed until 4 or 5 May 2020, or what was occurring during the nearly three weeks between the Third Air Force legal office's review of the record 20 May 2020 and the mailing of the record to JAJM on 8 June 2020. Nevertheless, although aspects of the post-trial process might have been accomplished with greater efficiency, in the absence of any particularized prejudice to Appellant, we find no violation of his due process rights.

Finally, recognizing our authority under Article 66(d), UCMJ, 10 U.S.C. § 866(d), we have also considered whether relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 742 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude no such relief is warranted in the particular circumstances of this case.

## III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

MEGINLEY, J. (concurring):

I concur with the lead opinion, but write separately to address the questioning of Ms. W and the effect it may have had on the Defense. Before doing so, I note when MW told her mother that she had been sexually abused by Appellant, it was probably one of the worst days of both MW and Ms. W's lives, an event that will unquestionably have lifelong consequences for their entire family. Yet, the questioning to which Ms. W was subjected by the military judge made a bad situation even worse. This is not to say that Judge Milam should not have asked Ms. W tough questions. As the trier of fact, he had a duty to do so; but the record shows that Judge Milam went too far. As articulated in the majority opinion, scolding, lecturing, and chastising Ms. W for some of the actions she did or did not take was unnecessary and lacked judicial decorum.

Trial counsel's concern, advising Judge Milam that "the manner and tone of the court's questions was unexpected," and subsequent request for a delay (for nearly an entire day), in part, to rework their strategy and witness lineup, shows how significantly the questioning impacted *their* case. Once trial counsel noted they would need to discuss the situation with their expert and acknowledged that "the [D]efense will need time to obviously interview them, which they have not," trial defense counsel responded with, "[W]e're happy to take whatever time is necessary to interview a witness but I think the [D]efense's position is we'd like to continue the trial." This appears to be the extent of the Defense's response to and position on this issue before Judge Milam granted the Government's request for a delay.

Appellant argues that Judge Milam's treatment of Ms. W revealed an apparent bias that raised a substantial question as to his apparent impartiality in this case. The problem with Appellant's argument is that bias was more of an issue for the Government in the middle of the trial—it was the Government who was clearly concerned how to approach this problem, and arguably, whether it was receiving a fair trial. With that said, "[J]udicial remarks made during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *United States v. Howard*, 50 M.J. 469, 472 (C.A.A.F. 1999) (Sullivan, J., concurring) (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)). As such, had the Defense joined with the Government to question or voir dire Judge Milam about any potential bias, disposition, or partiality he may have had towards Ms. W (or to any party or witness), or made their motion for a mistrial during trial, Judge Milam's responses may have indicated this was not an ordinary situation, and it is possible this court would be issuing a different opinion.

It is difficult to determine how Judge Milam's treatment of Ms. W prejudiced the Defense, particularly given that the Defense was quiet on the issue (of course, until after the verdict was announced)—*unless* the Defense altered

their case strategy and tactics based on what Judge Milam may have been thinking. Based upon my review of the record, the Defense's relative silence as to this matter as it was occurring was a strategic decision. In other words, they took a gamble on the possibility that Judge Milam made a certain determination about the credibility of Ms. W (perhaps that she was deceitful), and how that would influence his ultimate verdict. To the extent the Defense modified its strategy in reliance upon Judge Milam's perceived bias, such an ill-fated gamble was a risk the Defense chose to take.

Even so, in conveying the importance of Ms. W's testimony with respect to Appellant's court-martial, Judge Milam acknowledged Appellant was facing a "tsunami" in regards to the allegations. Part of navigating that "tsunami" was Appellant's decision on whether to testify. It would certainly be unfortunate if Appellant had intended to testify, but was influenced not to, as a result Judge Milam's questioning of Ms. W. I also suspect the questioning presented agonizing dilemmas for the defense counsel in their advice to their client about a course of action, advice which would impact the remainder of Appellant's life. We may never know. One can only imagine the excruciating emotions, and decisions, on both sides, that were being made as a result of the military judge's questioning of Ms. W. It is troubling that this court-martial may be remembered more for the exchanges the military judge had with the victim's mother, than for the fact that a child was sexually abused.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court